MANLY'S ADM'R *vs.* TURNIPSEED AND WIFE.

[DETINUE FOR SLAVES.]

1. *When statute of limitations begins to run.*—The statute of limitations does not begin to run against an intestate's estate, until the appointment of an administrator; but it is not necessary that there should be a domestic administrator, when the intestate dies in a foreign State, and administration on his estate is there granted by the proper tribunal, although such foreign administrator may have never had his letters recorded here, as authorized to do by the act of 1821. (Clay's Digest, 227, § 31.)

2. *What constitutes adverse possession.*—A knowledge on the part of an adverse holder that his title is defective, does not, of itself, prevent the operation of the statute of limitations in his favor.

APPEAL from the Circuit Court of Calhoun.

Tried before the Hon. S. D. HALE.

THIS action was brought by M. J. Turnley, as the administrator of Washington Manly, deceased, to recover a negro woman named Elizabeth, and her five children ; and was commenced on the 12th March, 1857. The defendants pleaded, "in short by consent, *ne unques administrator*, the statute of limitations of six years, and the general issue, with leave to give in evidence any matter that might be specially pleaded." The woman Elizabeth, as appeared from the evidence adduced on the trial, belonged to said Washington Manly at the time of his death, which occurred in June, 1838, at his residence in Stewart county, Georgia ; he dying intestate, and leaving a widow and several children. In October, 1838, the widow and children removed to Calhoun county, Alabama, bringing the slaves with them. In December, 1838, the orphans' court of Calhoun appointed William Walker guardian of said intestate's minor children ; and he continued to act in that capacity, having the control and management of the slaves, until the 23d January, 1840, when he resigned, and Henry Amarine was appointed guardian in his stead. Some time during the year 1842 said Amarine married the intestate's widow, and he continued to act as the guardian of the children, having the possession and control of the slaves, until the 3d March, 1848, when he resigned, and William Barker was appointed by said court guardian of said children. In November, 1848, said Barker applied to said court for an order to sell the slaves ; alleging, as the ground of his application, that the intestate's widow (then Mrs. Amarine) was entitled to a distributive share of them, and that they could not be equally divided without a sale. The court granted the order, and the slaves were sold, pursuant to its terms, on 28th December, 1848, and were purchased at the sale by said Amarine, who, on the 6th December, 1855, sold and conveyed them to the defendants. The plaintiff's letters of administration were granted, by the probate court of Calhoun county, on the 10th March, 1857. There had been no previous administration on said estate in this State ; but letters of administration had been granted by

the proper court in Stewart county, Georgia, on the 11th January, 1847, to one George L. Smith.

On the foregoing facts, the court charged the jury as follows : " If the jury believe, from the evidence, that Washington Manly died in Georgia, in 1838, the owner of the woman Elizabeth; and that the other negroes sued for are the children of Elizabeth; and that said negroes, shortly after the death of said Manly, came to Alabama with his widow and children; and that in December, 1848, Barker, acting as the guardian of said children, held and claimed the negroes, as such guardian, in good faith, and, on that day, sold them under an order of the orphans' court of said county; believing that he was selling and conveying a good title ; and that Amarine became the purchaser at said sale, in good faith, and at a fair price, believing that he was buying a good title ; and that he complied with the terms of the sale, took possession of the slaves, and, in good faith, openly held, claimed and controlled them as his own, until the 6th December, 1855, and then sold them to the defendants, for a fair and full price, believing that he was selling a perfect title ; and that the defendants purchased in good faith, believing that they were obtaining a good title, and held and claimed the slaves openly as their own, down to the commencement of this suit; and that George L. Smith was appointed administrator of the estate of said Washington Manly, in Stewart county, Georgia, on the 11th January, 1847, (as shown by the record which has been read in evidence,) where said Manly died; and that said Smith, at the time of his said appointment, had notice that said slaves were in the county of Calhoun or Randolph, Alabama,—then the statute of limitations had, at the time this suit was brought, barred any action to recover the slaves by an administrator of said estate, and they must find for the defendants."

The plaintiff excepted to this charge, and requested the court to give the following charges, which the court refused to give, and the plaintiff excepted to their refusal; to-wit :

" 1. If the jury believe that the slaves were originally

the property of Washington Manly, who died in Georgia, in 1838 ; and that said slaves were removed into this State in 1839, by the widow, without any administration thereon, and have continued in this State until the present time ; and that there was no administration on Manly's estate, in Alabama, until the plaintiff was appointed in 1857,—then the statute of limitations would not run in favor of the defendants until the plaintiff's said appointment.

"2. If the jury believe that the slaves were once the property of Washington Manly, and were removed from Georgia, by the widow, without any administration thereon, and have continued in this State until the present time ; and that there has been no administration on said slaves, in this State, until the plaintiff was appointed in 1857,— the statute of limitations did not run in favor of the defendants until the plaintiff was appointed administrator, although George L. Smith was appointed administrator of said estate, in Georgia, in the year 1847.

"3. If the jury believe that Amarine, at the time he purchased the slaves, had a knowledge that there had been no administration on Manly's estate, then he took no title by his purchase ; and if the defendants had notice of a defect of title, when they purchased from said Amarine, they took no title.

"4. The appointment of Barker, as guardian of Manly's children, gave him no rights over the property of Manly's estate here.

5. "If the slaves were originally the property of Washington Manly, who died in Georgia in 1838, and were removed here by his widow, without administration, and have continued in this State up to the commencement of this suit,—then the appointment of Smith in 1847, as shown by the record, did not vest the property in him as administrator, and the statute of limitations could not run against plaintiff until his own appointment.

"6. If the jury believe that Amarine bought, at the guardian's sale, with a full knowledge that the slaves had never been administered upon, either in this State or in

Georgia, then his purchase was not in good faith, and the
statute would not run in his favor ; and then, if the de-
fendants have not held the slaves more than six years since
they purchased from Amarine, the statute would not effect
a bar in their favor, although Smith was appointed in 1847,
in Georgia.

"7. If the jury believe, from the evidence, that the wo-
man Elizabeth was the property of plaintiff's intestate at
the time of his death in Georgia in 1838, and was brought
to Alabama, shortly after intestate's death, by his widow ;
and that said widow married Henry Amarine in this State ;
and that said Amarine took possession of said slaves, as the
guardian of said Manly's children, knowing that said slaves
had [not] been administered ; and that the slaves after-
wards went into the possession of Barker, as the guardian
of said minor heirs, and were sold by him as such guardian,
knowing that no administration had been had on them,
and were purchased at the sale by said Amarine, with such
knowledge, and the defendants had knowledge that said
slaves had never been administered upon,—there could be
no good faith in said several sales and purchases."

The charge given by the court, the refusal of the several
charges asked, and the rulings of the court on questions of
evidence, to which exceptions were reserved, (but which
require no particular notice,) are now assigned as error.

G. C. WHATLEY, for appellant.—When a person dies
intestate, the statute of limitations does not begin to run
against his estate, until the appointment of an administra-
tor who is capable of suing.—*Lawson v. Lay*, 24 Ala. 186 ;
*Wyatt v. Rambo*, 29 Ala. 510. As the plaintiff's letters
were granted only a few days before the suit was com-
menced, and there had been no previous administration on
his intestate's estate in this State, his claim could not be
barred by the statute, unless the appointment of an admin-
istrator in Georgia, in 1847, brought the case within the
operation of the statute. But no such effect can be attri-
buted to the foreign administration. In the absence of

statutory regulations, a grant of letters of administration has no extra-territorial operation, and an administrator can neither sue nor be sued in another State.—*Vaughan v. Northup*, 15 Peters, 2; *Harrison v. Mahorner*, 14 Ala. 834. Under our statute, (Clay's Digest, 227, § 31,) a foreign administrator may sue here, upon complying with certain conditions; one of which conditions is, that he shall first have his letters recorded here, and give bond "for the faithful administration" of the assets; and the statute expressly provides, that he shall not be entitled to receive or recover any property of the estate, until he has complied with these requisitions. A compliance with these provisions makes an ancillary administration here.—*Robinson v. Robinson*, 11 Ala. 950. A foreign administrator is not bound to sue here; it is not his duty to sue here, and he is not guilty of a *devastavit* for a failure to sue.—*Davis v. Smith*, 5 Geo. 295. If the Georgia administrator was not bound to sue here, and could not demand or recover the property without first complying with the requisitions of our statutes, no right of action vested in him by his appointment, and the statute of limitations did not begin to run against him. 6 Bacon's Abr. 398, note *a*; *Johnson v. Wren*, 3 Stew. 179; 1 Kelly, (Geo.) 380. If he had complied with all the conditions imposed by the statute, and then commenced suit to recover the slaves, his action might have been defeated by the appointment of a domestic administrator.—*Broughton v. Bradley*, 34 Ala. 694; 3 Mass. 540. An executor may commence suit before he qualifies; but the statute of limitations does not begin to run, until his qualification and acceptance of the trust.—6 Geo. 316.

2. To render a plea of the statute of limitations available, there must be an adverse possession; and to constitute an adverse possession, the holding must be in good faith, and without notice. The defendants had actual knowledge of the defect in their own title, and are chargeable with implied notice of the plaintiff's claim.—*Johnson v. Thweatt*, 18 Ala. 747; *Nelson v. Allen & Harris*, 1 Yerger, 366.

HEFLIN & FORNEY, ALEX. & JNO. WHITE, *contra.*—Under the statute of 1821, (Clay's Digest, 227, § 31,) the Georgia administrator had a right to commence suit here for the recovery of the slaves; and he was only required to record his letters, give bond, &c., after the rendition of a judgment in his favor, before he was entitled to receive the property. He was obliged to produce his letters on the trial, as the evidence of his right to sue, just as a domestic administrator would. The recording of his letters, giving bond, &c., did not constitute a condition precedent to his right of action. As well might it be contended, that the statute of limitations would not run, in an attachment case, against a foreign administrator who had complied with all the requisitions of the act of 1821, because he was required to execute an attachment bond; or that the statute does not run against corporations, or in actions of detinue, bills for injunction, &c., and other analogous cases in which bonds are required of the parties suing. All the analogies of the law are in favor of his right to sue, and the adjudged cases equally support it.—*Shultz v. Pulver*, 11 Wendell, 361; *McCullough v. Young*, 1 Binney, 63; *Howell v. Hair*, 15 Ala. 194; *Broughton v. Bradley*, 34 Ala. 694. Moreover, the slaves were in Georgia at the time of the intestate's death, and the Georgia administrator knew that they had been removed to Alabama without authority of law, and where they were to be found; and it was not only his right, but his duty to sue for them.

A. J. WALKER, C. J.—The plaintiff's intestate died in possession of the slaves, for the recovery of which this suit is brought, and had his domicile, at the time of his death, in Georgia. The defendants, and the person from whom they bought, have been in adverse possession for more than six years before the commencement of the suit. The plaintiff's administration was obtained less than six years before the commencement of suit, and there had been no previous administration in this State. There was an administration in Georgia, more than six years before this suit was brought,

and before the plaintiff was appointed. If there had been no other administration than the plaintiff's, it is very clear that the defense of the statute of limitations would not have been available. The operation of the statute, after the death of the intestate, can not commence until there is an administrator.—*Lawson v. Lay*, 24 Ala. 184; *Johnson v. Wren*, 3 St. 172. This is admitted by the appellees; but it is contended, that the operation of the statute is secured by the existence of an administration in Georgia, to which the right of suit attached by virtue of our statute, found in Clay's Digest, 227, § 31; and that is the position, upon the correctness of which we are to decide.

The statute of limitations which applies to this case, explicitly declares, that all actions of detinue shall be commenced within six years next after the cause of such action shall have accrued, and not after.—Clay's Digest, 326, § 78. Notwithstanding this explicit language of the law, the courts, from the clear justice and propriety of the thing, have engrafted an exception, in favor of those cases in which there is no person to sue.—Ang. on Lim. 61, § 50. Our statute gives a right of suit, in the absence of an administration here, to the administrator in a sister State; and it would be a manifest enlargement of the exception, to include a case where there was such a foreign administrator. We do not pause to consider whether it is obligatory upon the foreign administrator to sue, when there is no administration in this State.—*Shultz v. Pulver*, 11 Wend. 361; *Helme v. Sanders*, 3 Hawks, 563. It may be conceded, that the statute merely secures a privilege to the foreign administrator, of which he may or may not avail himself at his election; and from the concession no inference in favor of the appellant can be deduced. The exception is founded upon the want of a person who *can* sue, and not upon the want of a will to sue. No person, save those who are acting in a trust capacity, is bound to sue. The right of suit is merely permissive; and the operation of the statute is grounded upon the idea, that persons having the permission of the law to sue, forbear to do so,

34

but acquiesce in the assertion of a hostile right. The efficiency of the statute would be utterly destroyed, and its command disregarded, if it were allowed no operation except where there was an obligation to sue.

It is contended, however, that the right of suit does not attach to the foreign administrator, by virtue of his foreign appointment, but grows out of his recording the letters of administration, and giving bond, as required by our statute ; and that, upon complying with those requisites, an ancillary administration springs up in this State, under which the suit is maintained, and the assets received. This argument is supposed to be favored by the fact, that this court, in *Robinson v. Robinson*, (11 Ala. 947,) spoke, *arguendo*, of the recording of the letters of administration, and giving the prescribed bond, as "in effect an ancillary administration." We do not think the argument is supported by the incidental remark alluded to. The court intended nothing more than to convey the idea, that a foreign administrator, who had complied with the statute, had authority, like that of an ancillary administrator appointed in this State, to recover assets of the estate, which were the subject of an administration in this State. That a foreign administrator, who complies with our statute, does not become an ancillary administrator, and recover assets here in a new capacity, derived in this State, is conclusively shown in the case of *Broughton v. Bradley*, 34 Ala. 694. If such foreign administrator became an ancillary administrator, within the jurisdiction of this State, it would follow, that no ancillary administrator could afterwards be appointed in this State, and that the authority of the foreign administrator could not be overthrown by the appointment of an ancillary administrator ; yet the reverse of these things is held in the case referred to.

The conclusion can not be resisted, that a foreign administrator, under our statute, is permitted to act in this State, by virtue of his foreign appointment, and in the capacity derived from that appointment. The language of the statute itself does not admit of any other conclusion. It be-

stows the right upon the foreign administrator to maintain any action, to demand and receive any debt, and to exercise all the rights and privileges which he would have done if duly appointed and qualified in this State. It does not even require that the letters of administration should be recorded before suit is brought. The foreign administrator is permitted to sue here, without a solitary preliminary step. This conclusively shows, that our law recognizes in him a right of action by virtue of the foreign appointment. The requisition, that the foreign administrator shall, before receiving any assets of the estate, record his letters of administration, and give bond, does not militate against the operation of the statute. The prescribing of conditions, necessary for the security of persons interested, as a preliminary to a remedy, can not justify an exception from the statute. If it did, there could be no prescription against an action which the law required should be preceded by the giving of security for cost, or other bond; and yet, we apprehend, an argument for the exemption of such cases from the statute would not be made.

The statute of limitations was designed to be one of repose. Its effect is beneficent. It quiets titles, lessens litigation, and promotes justice, by requiring the settlement of controversies before time has obliterated any of the evidence. Its operation ought to be maintained with a steady hand. This we should not do, if we allowed it no effect against a foreign administrator, clothed by our law with a right to sue. A foreign administrator, if he is not affected by our statute of limitations, might designedly fold his hands, and remain quiet, until time should destroy all the evidences upon which a just defense depended, and then obtain an unrighteous recovery. It would be a most unjust and unreasonable discrimination, to bar by the lapse of time the claims of our own administrators, and yet put no limit to the right of suit, on the same claims, in favor of a foreign administrator; yet this discrimination the appellant asks us to make. When the legislature gave a right of suit to foreign administrators, it must have intended that

they should be subject to the same defenses as other administrators.

[2.] The bill of exceptions contains the entire evidence. We clearly perceive that the ruling of the court, in refusing to suppress the answer mentioned in the brief of appellant's counsel, even if erroneous, did not affect the result of the trial, and did the appellant no injury. A knowledge on the part of an adverse holder that his title was defective, would not, of itself, prevent the operation of the statute in his behalf.

We do not deem it necessary to notice particularly each separate charge asked, and each ruling upon evidence. What we have said covers all the points made by the counsel. There is no reversible error in any of the rulings of the court below, and its judgment must be affirmed.